Calobrisi v. Booz Allen Linda Correa, Calabresi Linda Correa, Calabresi v. Calabresi Linda Correa, Calabresi v. Booz Allen May it please the court. Steve Robinson with my partner Sarah Belger. I represent Booz Allen. One of the issues that we focused on in our brief and I want to just touch on initially is there are substantial differences in the comments by my counsel compared to the record. Let me just give you an example. She contends that Mr. Osborne sought out information about the age of the people in the law department. Well, if you look at a joint appendix 1210, Mr. Osborne sent an email that said he wanted, quote, law department demographics, age distribution, diversity, overall data for five years, not by individual. Do we have data about diversity of our teams and diversity used by outside counsel? How big is the law department? The law department in those days, Your Honor, was about 25. Well, I think that you pretty much know the individuals that are involved. I think you do. If what you're relying on is not by individual, I'm not sure how far that goes. Well, and frankly, I don't think there's any nefarious information that ought to be inferred from the fact that he's asking about information concerning diversity. It's consistent. That is a different point, though. You started out saying all he's asking for is the general age and sex of the department. Fair point. But if there are only 20 people. Fair point, Your Honor. I would like to note also there's no evidence in the record at all that Mr. Osborne attended this meeting, which, again, is a total red herring. It was a meeting of a lot of people across Booz Allen in October, as they periodically do to evaluate groups of people in various departments at various professional levels. There's no indication that that meeting or anything that was ever said in that meeting had anything to do with the decisions involving Ms. Calabresi. And to get back to Judge – Well, there were a lot of depositions taken here. Was anybody asked about the meeting? Oh, man, were there ever. Yes, there were a number of people asked. First of all, Mr. Myers, who was not only the 30B6 designee, but also the plaintiff's supervisor, testified that neither Mr. Osborne nor Mr. Appleby attended that meeting. There was no evidence at all in the record in terms of email traffic or any other documents. Myers is one of the young assistant general counsels? That's correct, Your Honor. He is. He was the plaintiff's immediate supervisor. Ultimately? Yes, correct. Okay. But to go back to Judge Gregory's point, this was a business decision, plain and simple. To note, to pick up on what Judge Keenan said, there was a covenant not to compete. They could not do significant international and commercial business during the period of time of the covenant not to compete. The court was asked – the court asked my colleague if there was any evidence in the record that talked about how much commercial or international work the plaintiff did. And she said, oh, yes, she did a lot. Well, if you look at Joint Appendix 930 and 933 when I'm deposing the plaintiff, she concedes that she did less than 10% of her time doing international and commercial work. And that's logical because Booz Allen couldn't do any of that. And that's the reason, really, that the whole issue about who was going to handle this great increase in work came about. It doesn't make any difference who the decision maker is because there's absolutely no evidence of pretext. There's absolutely no evidence that this was anything other than a business decision. And as Judge Gregory notes, the employer gets to make those decisions. We maintained all along it was Mr. Appleby. Mr. Appleby was deposed three times. To go to your question, Judge Mott, about depositions, there were a lot of them. Not only Mr. Appleby, but every other individual who was deposed on behalf of Booz Allen indicated it was Appleby's decision, which makes sense because he's the general counsel. But it doesn't make any difference. We don't need the Proud versus Stone inference. But let's accept the plaintiff's position for a moment, that it's indeed Mr. Osborne. Well, what does that mean? First of all, Mr. Osborne had serious difficulties with the plaintiff's job performance. Undisputed that the plaintiff presented to him a lease to sign that would have resulted in Mr. Osborne being personally liable for a Booz Allen lease in some far-flung country. When he was asked at his deposition, the same point that my colleague raised, why didn't you hire a bunch of other people to come work under my client? He said, very simply, because she did not have the substantive depth that Ms. Tinsky had in international law and that Ms. Storms had in commercial law. In fact, at page 656 of the appendix, you'll see the plaintiff admit, quote, I'm not a government contract lawyer. Well, it's apparent from the record, Booz Allen is a government contract company. That's a big part of what they do. So there are clear business reasons why this was done. There's absolutely no evidence to rebut it. So what does the plaintiff try to do to show, gee whiz, there was discrimination? Well, first of all, she admits that Mr. Osborne never said anything to her about her age or her gender. She then shifts gears and says, well, let's talk about the comparators. And she says the comparators are Mr. Myers, her immediate supervisor, Mr. Manya, a level above her, which, as the court is aware, makes it very difficult for them to be comparators, and then two women. Now, Ms. Storms was eight or nine years younger than the plaintiff. Ms. Tinsky was significantly younger, 15 or 16 years. But the upshot of that is there are no comparators on the gender claim at all because the work was given to other female lawyers. And in terms, again, of going back to the business justification, the plaintiff admitted in her deposition that she did not have the business experience that Ms. Tinsky had. And, for instance, the Foreign Corrupt Trade Act anti-bribing statutes, which are big deals for government contractors, as the court is well aware. And also admitted that she didn't have the commercial experience that Deborah Storms had. And she really couldn't say that she did, because Ms. Storms had previously served as a general counsel of a company in Northern Virginia before she came to Booz Allen. So what does that leave her with? It leaves her with her Me Too evidence. Well, if you accept her argument that Mr. Osborne made the decision, where does that go? Well, first of all, as your honors are well aware, evidence has to be relevant under Rule 401. And that means it has to have some ability to shed light. The Supreme Court said this evidence should be examined case by case, not put off to the side on a generality. That's correct, your honor. And I think it's clear if you look at the opinion from the district court that the district court looked at this evidence in substantial detail. Now, if the issue is did Mr. Osborne make a decision based upon discriminatory intent, let's look at these seven people. None of them ever worked for Mr. Osborne. There isn't even any evidence in the record, your honor, that Mr. Osborne even knew any of these people. As I believe Judge Cannon had noted, four of them didn't even work in the law department. Ms. Shafford left in December of 2006, five years before the events giving rise to this litigation. Mr. Osborne didn't come to Booz Allen until 2010 from General Motors. Deborah Sherman, the other lawyer that they contend is somehow a factor, left with a spinoff that resulted in the covenant not to compete that we're talking about in 2008. And if you read the record, it's clear she left because, as she said at her deposition, I was a commercial lawyer. There was no more commercial work to do. I followed my work. However, if you look at the brief of my opponent, they clearly confused to be charitable. The facts appear to argue that this happened before Ms. Storms left for Booz and Company. It clearly didn't. She left because, to go back to the point we've made several times, there was no more commercial work to do. So then we're left with four people, none of whom ever worked in the law department. One of them, Molly Finn, was a partner, which was five levels below the level of the plaintiff, and three other people who were in other areas of the firm. No commonality of supervisor. No commonality of any shred of evidence of a corporate culture of discrimination. No basis at all to conclude that somehow this was a pattern in practice, to go back to Judge Gregory's point. In fact, what really- When did the pattern in practice language come in? They're not trying to claim a class action. Well, Your Honor, you're correct. We didn't bring it up. Well, here's what happened. What they tried to do from these anecdotal pieces of evidence of seven individuals is somehow persuade the court that there was a disputed issue of material fact about whether there was a pattern in practice of discrimination. I mean, part of the problem with this case, and again, as you dive into the record, or your law clerks will, you'll see it. We've pretty much- The plaintiff continues to suggest that her theories are facts in many instances, and this is yet one of them. The plaintiff at one point in time contends the leadership team must have made some decision involving the plaintiff. Well, as we spell out in our papers, leadership team is a group of 10 or 12 people that run a $6 billion operation. Booz Allen has 25,000 or 30,000 employees. The evidence is clear. Mr. Appleby testified to it. Mr. Osborne testified to it. Nobody in the leadership team got down enough in the weeds to deal with the restructuring of a couple positions in the law department. And let's look at what the restructuring really did. Ms. Calabrese became the head of real estate international and commercial in 2009 when there wasn't a whole lot of international and commercial work to do. She was a principal because she'd been there for quite a while. And it's undisputed, by and large, she was a very good real estate lawyer. The two lawyers who were going to do the additional exponentially greater levels of work, Karen Tinsky and Deborah Storms, were senior associates. So all basically Booz Allen did was put the plaintiff at the same level of the individuals who were going to be doing the same kind of work and had the same level of responsibility. It was a clear equalization. The constructive discharge claim I want to touch on very briefly. The plaintiff admitted she was asked repeatedly to stay at Booz Allen. She was told she could stay as long as she wanted. She was making $310,000 a year. Under the standard in this circuit for intolerable working conditions, I don't think we're even close. She makes a big deal out of having to sign a document that says she voluntarily accepted the demotion. She was employed at will. As we all know, if she didn't like those conditions, she could leave at any time. The evidence is undisputed. The reason Booz Allen gave her that memorandum was because April 1st was the beginning of Booz Allen's fiscal year. And he wanted to ensure that there was no misunderstanding on the part of either Ms. Calabrese or the firm about what the circumstances of her continued employment were. If she didn't like it, she could certainly leave. I'd like to shift gears, if I could, very briefly to the sanctions argument because I know I have a little more time to deal with that coming back up. But I just want to lay out three or four significant facts. This case was filed in the District of Columbia, as you all know, a notoriously plaintiff-friendly jurisdiction. The only connection between this case and the District of Columbia was contained in paragraphs 43 and 44 of the complaint, which the plaintiff indicated were, quote, upon information and belief that this meeting occurred at the Cosmos Club. The trial judge in the District of Columbia allowed the plaintiff several months of jurisdictional discovery, which conclusively established absolutely no evidence to support the plaintiff's allegation that a meeting occurred prior to her being told on January 26th in Virginia that she was going to be demoted. In fact, the evidence showed there was a meeting in February that had nothing to do with the plaintiff's demotion. Now, the plaintiff, when confronted with this, began to shift gears a little bit and said, oh, maybe something happened in that February meeting that might have impacted my employment situation. Well, the problem is the plaintiff alleged in her complaint that as of the January 26th meeting, the decision concerning her employment status was, quote, a done deal. So following months of discovery, I sent plaintiff, well, first of all, when the case came in with these allegations, I immediately sent an email to my opposing counsel and said, there's no evidence that this meeting occurred in D.C. at the time. I can guarantee you it didn't. I then submitted three affidavits. I submitted the billing receipt from the Cosmos Club. I submitted the reimbursement form from Booz Allen that showed the one and only meeting occurred in February, three weeks after she was told about her demotion. We had six months of jurisdictional discovery and additional pleadings. On June 9th, I sent a five-page detailed letter to plaintiff's counsel, quoting deposition testimony of the plaintiff where she said she did not have any new facts, pointing out to her there was no basis to continue to pursue the case in the District of Columbia. They proceeded. We eventually won. When the matter was first brought up before the magistrate judge, it's really unclear as to exactly what he ruled. He said he was ruling upon the basis that a motion, never specified what motion, that motion could not vexatiously multiply proceedings. When we got to the district court on a Rule 72 objection, the district court said that we were not entitled to sanctions because, quote, the matter was related to the case, unquote, which, again, is not a standard that any court has ever determined. I'm out of time. I'll be happy to pick it up in my remaining moments. Thank you. Thank you, Your Honor. Thank you. I want to touch on the sanctions only because that was the last thing, but Booz Allen had to establish by clear and convincing evidence that we unreasonably or vexatiously multiplied the proceedings, and there is no proof, much less clear and convincing proof. We filed a motion to challenge jurisdiction and venue. The court agreed with us and allowed us to take discovery, and the court directed us to follow up with briefing, and I think we've laid out in our briefing more than adequately why and how we went about doing what we did there. This was a bully tactic by the defendant to try to intimidate my client and me to dismiss the case, and the proof of that is in writing and it's in the record, and it was nothing more than that. And without clear and convincing evidence that we unreasonably or vexatiously multiplied the proceedings, the district court's ruling on this should not be disturbed. I'd like to touch on the retaliation because I didn't do that earlier and because my colleague falsely indicated that it's undisputed that this was just an April 5th letter because it happened to be the start of the fiscal year. It is documented in writing. These are not credibility questions among witnesses. On March 3rd, there was an email from HR to Ms. Calabresi's supervisor saying, here are the points of the future terms and conditions of her employment going forward, that they had already gone over with her in the January demotion meeting. On March 24th, Ms. Calabresi went to Betty Thompson, the HR person, and said that she thought she was discriminated against based on her age and her sex. On April 5th, she was given a letter that she had to sign that now included, after she had complained about discrimination, the line that says, I voluntarily accept this transfer. And that was false, and they knew it, and they did it to disadvantage her in litigation because any reasonable person would think that if they tried to go forward on a discrimination case, having signed something that says, I voluntarily accepted this demotion, that person is going to have a problem. That was intended to deter her and to dissuade her from filing a discrimination claim, and that is exactly what Burlington Northern goes to, and that's retaliation. A couple of other points that my colleague raised. He said first that there's no connection between Mr. Osborne and the October 22nd meeting. That is absolutely false. In the record, there is an email that mentions the Yolanda notes, which are the notes that describe the October 22nd meeting, and that's at 1169.70 of the record. And before that is Mr. Osborne's email the day before saying he wanted Carla Calabresi's roles and goals for the meeting that was to take place the next day. Osborne is on the email that distributes the meeting information, which is at 1169.70, and I do not- Does anything in the deposition testimony show that he attended it? No. Mr. Myers, I do not believe Mr. Myers testified that Osborne did not attend. Myers was not present for that meeting. Myers wasn't invited to that meeting. Did some deposition witnesses testify that he wasn't there? No one testified whether or not he was there. Mr. Osborne was, again, raised the issues of her performance after we were in litigation and did not raise those issues with her in the demotion meeting, and that is a shifting reason for Booz Allen's decision, and that is enough to get past summary judgment under Jacobs. No one testified that Mr. Osborne was not at that meeting. Mr. Osborne was invited to that meeting. The email shows that. Did Mr. Osborne ask to be at that meeting? We got that document completely divorced from each other, and we didn't-I don't think we had that when we did his first deposition. But he was deposed several times. He was deposed twice only because we had jurisdiction and venue depositions. We had two-hour depositions at the beginning. By the time of the second deposition, you had the evidence, right? I'm not entirely sure that we did have that, Your Honor. But he didn't-in any event, he wasn't asked that. He was not asked that. But the documentary evidence seems to show that he was invited to that meeting. He sent an email the day before asking specifically for Ms. Calabresi's roles and goals in anticipation of tomorrow's meeting. That's his language. So your evidence-this is not direct Adam's case, but your evidence-basically your theory or evidence is that because Mr. Osborne asked for demographic data about the law department, that means that he was participating in this decision to demote. That means that it was based on discrimination. Age was a factor in his mind as he developed his vision for the law department. He was the incoming general counsel. He had been given the authority by Appleby well in advance of Appleby's retirement to start making staffing decisions. So he started that in August, and he implemented it in January. And he announced after that, after Ms. Calabresi was told that she was being demoted, that they were going-they announced to the entire law department that they were going to hire younger attorneys into the department. Now Booz Allen disputes that, but that's Ms. Calabresi's testimony, and they say, well, we might have said less experienced. But that's competing evidence, and that's for the jury to sort out. It's also false that Booz Allen's presentation that no one in the leadership team, as Mr. Robinson just said, you know, the leadership team is 10 or 12 people who are running a $6 billion company. They're not getting into the weeds about some decision in the law department. That's absolutely false. And the October 22nd meeting notes show that. In that meeting, what was discussed, in part, was Cal or Calabresi is not going to be leading the commercial and international work going forward. Rosansky was present. Strickland was present. They're both on the leadership team. Osborne, we believe, was present. But we can show that Strickland and Rosansky were present because their comments are elsewhere in those two pages of notes regarding other people. There's a reference, you know, Sam's thoughts are this, Horacio's comments are that. Counselor, the question I guess I have is that why isn't it the time normally that you would consider staffing a position like this when beforehand, during the non-compete period, you had a very capable, which is without dispute, lawyer, your client, in real estate, handling most of her job. And you're like, sometimes she did go to foreign venues in that connection. But she had sort of a dormant area, the international, about maybe 10%. Do you disagree that she couldn't have been doing the bulk of the work when they weren't doing the non-compete, correct? We do disagree because she was doing the work. Otherwise, they wouldn't have bothered for her to be a team lead. And they were doing. She was doing the work. But she clearly couldn't be doing the work that they anticipate after the non-compete spot, correct? Perhaps one person couldn't be doing that. But there isn't a reason in the record why she couldn't have managed that work. But why can't they make a decision that rather than a manager, we want someone who actually is better doing the work? Well, what they did decide well in advance of the non-compete expiring was to prepare the company to do that work. They were getting ready for that transition. And they assigned Ms. Calabresi to be the lead on that team, the X team, that was getting ready several months in advance of that. I'm sorry, it was six months before she was told she was being demoted. But this was a year in advance of when the non-compete was going to end. And her supervisor told her, this is going to be your time to shine. She was the person on the X team. She was the person who was developing the strategy. Maybe she was going to shine in real estate. That wasn't what he was conveying. This was going to be her opportunity. If she had a year in this position, this was going to be her opportunity to launch the vice president. So you're essentially saying they were required to let her do all of their international and commercial work. Is that really the subtext of your argument, they were required to let her do that? I'm not saying that they were required to do that, but it's for a jury to sort out whether it makes sense that just when she was on the cusp of this huge expansion of her practice areas, not the others' practice areas, her practice areas, that she would be ready to go and to lead that work. And her supervisor was telling her it was going to be her time to shine. And then suddenly they're telling her, no, not only are you not going to do that, even though we just told you that two weeks ago, you're going to be demoted and you're going back to senior associate position that you had eight years ago. You said a key thing there. You said shouldn't the jury be able to determine whether or not that made sense. At the court, we can't judge bad employer decisions versus good ones. We have to judge the ones that violate Title VII of the law. But you're right, the juror could say, you know, if they trained her to do all that stuff, she was on the ready team, would it have been better to let her stay on? It may have been, but that's not a business decision. That is a business decision, and that's the business decision that Booz Allen has put forward as part of the proof under Title VII. This is their business reason for what they did. It's the jury's role to decide whether that is the real reason or whether there was a discriminatory reason at play. And we have plenty of evidence that they could get to that. They will hunt that down where, in the record? What would they use to say it wasn't that real reason? What's your best, when they peel back everything, what would they find in terms of your best evidence? That Osborne was at a meeting, he talked about demographics, or that he was at meetings, which would it be? Hiding the actual decision-maker, lying about who the actual decision-maker was, discriminating against her based on all of the testimony that the other women could offer. They told her that this was going to be her time to shine, and then pulled the rug out from under her. The constructive discharge in the way that they conducted this, they knew every time they told her that she should accept the demotion or leave, that they were pushing her to leave. They weren't trying to encourage her to stay. And you know what? In the emails it says this was Betty's idea. Betty is Betty Thompson, the person that she complained to about discrimination. It was her idea to tell Calabrese, demote or leave. And so she did. And she tried to put the best face on it to hold her dignity by saying she was going to retire, just as Joan Hyde did, just as Shaffer did, and others whose testimony is relevant here and should have been more carefully analyzed by the court under the SPRINT standard that we articulated. I think a jury looking at Booz Allen's insistence that the leadership team had nothing to do with these decisions because they're way up here and Ms. Calabrese is down here is strong evidence that a jury could look at and say they're lying about this. They're lying about who made the decision, and they're doing that because Osborne had that tainted age as a factor in his mind when he was making staffing decisions. And we can demonstrate in the record that Rosansky was on the emails involving the communication to Ms. Calabrese that she should demote, accept the demotion, or leave the company. And he's on the leadership team. So it's just not true that they're not in the weeds, as Mr. Robinson mentioned. Rosansky was involved, and so was Strickland, and they're two of the leadership team members who were in the October 22nd meeting. And so that is other information that a jury could look at and decide that they were lying to dissemble. Did your client work in Northern Virginia? Did she? Yes. Did she work in D.C.? Occasionally there were meetings in D.C. Was there an office in D.C.? They had an office in D.C. that we took the position was their flagship office. They had an office? Yes. And how often of the year did your client work there? I don't have that number, Your Honor. You filed a case in D.C., didn't you? We filed the case in D.C. because there was a meeting that Mr. Osborne's assistant told Ms. Calabresi about that took place at the Cosmos Club. And after that, when she was told that she was – That's why you filed it because they met at the Cosmos Club? The Cosmos Club is in D.C. I know what it is. That's why you filed it in D.C., because they met at a club? You thought something detrimental to your client took place at that meeting, is that right? We thought that there was a meeting there where staffing decisions were made by the law department supervisors. You still think that? Still think that, and we think that even more. And did it discover you had on the venue question? Did it help you in that regard? We had competing evidence, Your Honor. We had Ms. Calabresi's good-faith belief based on what she was told by Osborne's assistant that there was a discussion there. Then she was told she was being demoted, and after that they announced to the law department that they were going to be hiring younger attorneys. She put that together and said that must be where the decision must have been made. We didn't have – so we had her testimony, her good-faith belief that that's what happened, versus their representations that that's not what was discussed at that meeting. And it just strains credibility, an agenda that includes staffing implications. Do we have the right people and the right numbers with the right skills to do the work? It strains credibility that Ms. Calabresi, who had been there for 11 years, was not discussed in that context. They testified that no one was discussed individually. No individual lawyer was discussed in that meeting, but it's not true. Hadn't your client already been told she was not going to be demoted before that meeting? She had been told that, but it was a decision that was in flux all the way until April because she kept asking about it. So if something was discussed at that meeting, it would be subsequent to her being already told she was going to be demoted, right? We didn't know exactly where all of the decisions were made, and it's not true that we were relying only on a meeting that we thought happened in January. There were other – all of the other events that went to the constructive discharge, where she was told that they had decided in the past that her work would be taken away. She was told that she wasn't going to be doing that work and she'd be doing less work, and she had no way of knowing where those decisions were made and who had made them. And so we had a dispute between the parties, and that shows a question that the court didn't agree with us on. But that doesn't mean that we pursued that vexatiously or unreasonably. And, in fact, once we were in full discovery in the district court, we found that, unfortunately, the district court's arbitrary decision to cut us off as of September in our discovery meant that we didn't get that Osborne email from August, where he said he was interested in the age distribution of the lawyers in the law department, which he said was the seed for his agenda in the February 15 meeting that took place in the District of Columbia. And under D.C. law, that would have been enough. Those are decisions involving Ms. Calabrese that were tainted by age discrimination because age should not have been a factor whatsoever in those decisions. That happened in February, and that should have been enough, if we had known about that, to keep us in the District of Columbia. But even so, we believed we had competing evidence. We had her testimony. We had her understanding. You're well over time, so unless Judge Gregory has a further question, I think you better go. Thank you, Your Honor. May it please the Court, let me start with the issue that was the subject of the last colloquy with my opponent. She says, quote, we had competing testimony. Let's look at the competing testimony. And I would suggest if the Court looks at the letter that I sent to Ms. Correa on June 9, 2014, which is found at page 456 of the joint appendix, I quote in substantial detail the direct deposition testimony that they say supports their claim that there was jurisdiction in D.C. Question, let me see, and let me make sure the record is clear. And if I misunderstand or misstate your testimony, feel free to correct me. You don't have any recollection of the specific date this was, correct? Answer, no. I don't have any recollection of the specific date. Question, and why couldn't it have been February 15th, which is the date of the Cosmos Club receipt, as opposed to a date in January? I don't remember it being February 15th. I didn't ask you that, ma'am. I asked you why it couldn't have been February 15th as opposed to a date in January. I believe it was January. And there's several more questions and answers, in which basically she says it's her belief. Well, the problem is at the stage for which we're seeking sanctions, and bear in mind, we're only seeking sanctions from the date of this January 9th letter through the conclusion of the ruling by Judge Cooper six or seven weeks later. All she does is continue to say, as she has done today, it's her belief. Well, the case law in D.C., which, again, was not really dwelt upon very much by either the district judge or the magistrate judge, is very clear. We cite the Healy v. Labgold decision, which goes back to Wallace, which is the critical 1927 decision in D.C. And in Healy v. Labgold, in which the plaintiff, who was a lawyer and his lawyer, so a lawyer plaintiff and a lawyer on the case were both sanctioned under 1927. The court finding, quote, an award under section 1927 requires a showing of deliberate action in the face of a known risk, the consequence of which the actor inexcusably underestimates or ignores. It's exactly what we have here. The plaintiff clearly, by June 9th when I sent the letter, knew that there was no factual basis to support her claim in D.C. She'd had seven months of jurisdictional discovery. She had been warned repeatedly that this behavior was inappropriate, and they continued to ignore it. I go back to the decision of this court that Judge Gregory was on, the Salvin decision, which we cite in our papers. This court wrote, quote, by refusing to voluntarily dismiss the case once its lack of merit became evident, Hennessey protracted litigation. Antico was forced to continue with its discovery obligations, file a summary judgment motion, and respond to Hennessey's opposition in that motion. And in that decision, the district court awarded sanctions under 1927, this court affirmed. To go back to a couple of other issues the court raised, and again, I apologize, but there's some significant differences in our recollection of the record compared to the plaintiff. Your rebuttal goes only to the sanctions? That's correct, Your Honor. Okay. And the final point that I want to make on the sanctions issue is that there is absolutely no indication in the record what the basis was of the district court's decision. No finding of fact, no conclusions of law. The court refers to an unspecified motion. I'm not exactly sure what that is. And probably most tellingly, the district court, right after it talks about this standard being, quote, reasonably related to the claims raised, which again, we don't believe has any factual basis, the court goes on to say that sanctions under 1927 should be awarded when a lawyer, quote, continues to present a claim where there is no factual basis. That's page 629 of the joint appendix. Again, I think as we've made it very clear, certainly by the June 9th letter, there was nothing in dispute. There were no facts that people didn't know. Four depositions had been taken. Hundreds of pages of documents had been produced. There was clearly no basis to continue the case in D.C. at that time. It's exactly the kind of circumstances this court has previously held that 1927 requires an award of sanctions. I'll be happy to answer any other questions the court may have. I think we're fine. Thank you very much. Thank you very much. We'll ask our good clerk to adjourn court, and then we'll come down and greet the lawyer. This honorable court stands adjourned. Signee die. God save the United States and this honorable court.
judges: Diana Gribbon Motz, Roger L. Gregory, Barbara Milano Keenan